MATT GONZALEZ (SBN 153486)
G. WHITNEY LEIGH (SBN 153457)
GONZALEZ & LEIGH, LLP
744 Montgomery Street, Fifth Floor
San Francisco, CA 94111
Telephone: (415) 912-5950
Facsimile: (415) 912-5951

Attorneys for Plaintiffs
Fekre Bekele, a.k.a., Fred Bekele
and Convenient Parking, Inc.

E-filing

FILED
APR - 4 2011
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

DMR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FEKRE BEKELE, a.k.a. FRED BEKELE, an individual and CONVENIENT PARKING, INC., a California Corporation,

Plaintiffs,

v.

NATHANIEL P. FORD, SR., a.k.a., NAT FORD, individually and as Executive Director/Chief Executive Officer of the SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY; CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY; and DOES 1-50, inclusive,

Defendants.

Case No. CV 11 1640

**COMPLAINT**

1. Violation of 42 U.S.C. §1983 (Deprivation of Civil Rights);
2. Violation of 42 U.S.C. §§1983 & 1985 (Conspiracy To Violate Civil Rights);
3. Violation of 42 U.S.C. §§1983, 1985 & 1986 (Failure To Prevent Violation Of Civil Rights);
4. Violation of Civil Code §52.1(b) (Interference With Rights);
5. Breach of Contract;
6. Breach of Implied Covenant of Good Faith and Fair Dealing; and,
7. Violation of §17200, et. seq. (Unlawful Business Practices).
8. Negligent Interference With Contractual Rights
9. Intentional Interference With Contractual Rights
10. Negligent Interference With Prospective Economic Advantage
11. Intentional Interference With Prospective Economic Advantage

**INJUNCTIVE RELIEF SOUGHT**

**PUNITIVE DAMAGES SOUGHT**

**JURY TRIAL DEMANDED**

Plaintiffs hereby allege as follows:

## JURISDICTION

1. This is a civil suit brought under the Federal Civil Rights Act, 42 U.S.C. §§ 1983, 1985 and 1986 for violations of the Fifth and Fourteenth Amendments of the United States Constitution.

2. This suit also alleges civil rights violations under Article 1, § 7, of the California Constitution, as well as, California Civil Code §§ 52.1(b).

3. Additionally, this suit also includes common law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, negligent and intentional interference with contractual rights, negligent and intentional interference with prospective economic advantage, as well as, alleges unfair business practices under California Business and Professions Code §17200, et. seq.

4. This suit further seeks the imposition of punitive damages, civil penalties, reasonable attorney's fees, expert witness fees and injunctive relief against all appropriate Defendants as permitted under 42 U.S.C. §§ 1988, 28 U.S.C. §1343(a)(4) and pursuant to Civil Code §§ 52, 52.1(a), 52.1(b), 52.1(d) & 52.1(h).

5. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331, 1343(a)(1-4) and the afore-mentioned statutory and constitutional provisions.

6. Finally, Plaintiff has timely filed a government claim under California Government Code § 910, et. seq.

## VENUE

7. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1-2) because at least one Defendant, the City and County of San Francisco, resides within the judicial district and a substantial part of the events or omissions giving rise to the claim occurred within the judicial district.

## PARTIES

8. Plaintiff FEKRE BEKELE, a.k.a. FRED BEKELE (hereinafter "Mr. Bekele" or "Plaintiff"), is an individual residing in the City and County of San Francisco, California.

9. Plaintiff CONVENIENT PARKING, INC. ("Convenient" or "Plaintiff"), is a California Corporation and a resident of the State of California, in which Mr. Bekele has an ownership interest.

1

COMPLAINT
*FEKRE BEKELE, a.k.a., FRED BEKELE V. NATHANIEL P. FORD, SR., a.k.a., NAT FORD, ET. AL.*

10. Defendant CITY AND COUNTY OF SAN FRANCISCO ("City"), is a municipality duly organized and existing under the laws of the State of California. The City is located in the County of San Francisco and State of California. At all times relevant to this complaint, the City operated by and through its agent, Defendant SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY ("SFMTA").

11. Defendant SFMTA, is a public entity located in the City and County of San Francisco and State of California, and at all relevant times herein, was the agent for, and under the direction and control of, the City.

12. Defendant NATHANIEL FORD, a.k.a., NAT FORD ("Nat Ford"), was at all times relevant to this complaint, Director of the SFMTA. As Director of the SFMTA, Nate Ford was the chief policy making authority of the SFMTA, and as such, had the power to determine how the SFMTA ran the bidding process for parking lot contracts and, ultimately, who was awarded such contracts.

13. DOES 1 through 50 are employees and/or officers of the SFMTA, other agencies, instrumentalities, public entities or municipal corporations that were the agents for, and under the direction and control of the City and/or SFMTA.

14. Plaintiff is ignorant of the true names and capacities of Defendants DOES 1 through 50, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend his complaint to state the names and capacities of DOES 1 through 50 when they have been ascertained.

15. In engaging in the conduct described herein, Defendants Nat Ford and SFMTA acted under color of law and in the course and scope of their employment with the City. In engaging in the conduct described herein, Defendants exceeded the authority vested in them under the laws of the United States, the United States Constitution, the laws of the State of California and the California Constitution.

## STATEMENT OF FACTS

SFMTA Hires Consultant To Make Bidding On Parking Contracts Fair To Smaller Companies

16. In the summer of 2007, the SFMTA hired consultant Barbara Chance to address multiple issues concerning the City's management and award of public contracts for City-owned parking facilities.

17. The SFMTA was concerned that, among other things, the City was not maximizing the revenues the City could derive from parking facilities, and that locally owned businesses were being denied entry into the competitive world of public parking contracts. Also, concerns that parking garage contracts were being awarded amid charges of influence peddling were notorious.

18. On June 19, 2007, Mr. Chance presented her recommendations, which included a plan for revising the process for contract bidding to enable a more open and competitive process.

19. In response to this, in early 2008, the MTA put together a new process for the awarding of parking garage contracts, in accord with the Chance consultant report and with input from both the Human Rights Commission and Small Business Commission, both of whom had received complaints about the existing process.

20. Among the primary recommendations that were adopted was encouraging smaller locally owned business to partner up with established companies so that they could gain a foothold in the industry. Also, Chance made recommendations already being used in other jurisdictions to encourage bid competition and which would keep the city from over paying for parking management services.

Mr. Bekele's Convenient Parking, Inc. Struggles To Compete With The Bigger Players

21. Mr. Bekele had emigrated from Ethiopia, via Germany and had studied business at UC Davis. He learned the parking garage business while supporting himself through school, and after graduating he continued to work in this field during the recession of the early 1990s when other work was scarce.

22. Eventually, Mr. Bekele helped bring his extended family to the US and has been proud to call San Francisco his home for the past 20 years. At the time of the bid on the 2008 parking garage

3

contract, Mr. Bekele was operating three different garages, as Convenient, a Local Business Enterprise ("LBE"), but his business growth had stalled because the bigger companies always managed to win the best contracts.

Thanks To SFMTA'S New Policies Mr. Bekele Gets His Chance To Compete

23. After securing a 250K loan for working capital requirements, Mr. Bekele, partnered up with Imperial Parking Corporation ("Impark"). Impark has operated garages in San Francisco for some time and are one of the bigger companies that have routinely won contracts in the area.

24. Due to the new policy change, Mr. Bekele hoped the SFMTA would favor a joint venture that would allow a locally owned business an entry into the management of these lucrative parking garage contracts. Impark has wide experience handling such jobs and does work throughout the U.S. and Canada including managing the parking for some well known sports venues such as the San Francisco Giants nearly 5,000 capacity parking garage at AT&T Park. They have the kind of experience Mr. Bekele knew he could learn from and which would quell any claim he couldn't operate larger parking venues.

25. Together, Mr. Bekele's Convenient and Impark formed a joint venture called IMCO, representing the forging together of the larger Impark and Mr. Bekele's smaller Convenient, precisely what the Chance consultant report had envisioned.

Mr. Bekele Gets His Chance To Win And The SFMTA Gets Its Chance To Validate Its New Process

26. On April 10, 2009, the SFMTA issued a Request For Proposal for the operation and management of parking facilities in the City, denominated RFP# SFMTA 2008/09-30 ("RFP").

27. A pre-bid Conference convened on April 24, 2009, that included twenty-eight individuals representing twenty-three vendors, including five from LBEs.

28. In June, 2009, IMCO submitted its final proposal and bid deposit, along with several other companies.

29. On or about September 21, 2009, IMCO was notified that it had won the portion of the contract designated "Group A", and that work towards finalizing an agreement would begin shortly thereafter.

30. Seven days later, on September 28, 2009, the formal period for parties to object to the RFP results expired. Neither of the parking companies that won smaller portions of the contract, Pacific and Five Star, had any basis to complain, nor did they complain during the final protest period.

31. Management of all garages in "Group A" under the new contract awarded to IMCO was to begin by February 1, 2010.

32. By winning the portion of the "Group A" contract, IMCO had outbid a number of companies with interests in the award of the contract, including Pacific Park Management ("Pacific") and Five Star Parking ("Five Star"). Pacific had won a portion of the contract designated "Group C", which paid 2/3 of the management fees payable under Group A, and Five Star had won a portion of the contract designated "Group B", which paid 1/3 of the management fees payable under Group A.

<u>After Winning Fair And Square, Mr. Bekele Gets Shaken Down By Powerful Interests</u>

33. On September 23, 2009 – only two days after the announcement of bid winners – Steven Kay's office, who represented Pacific, sent an email to (need first name) Patel requesting all information regarding the RFP to be forwarded to his office. Such action constituted improper lobbying by his office because all bid participants were only allowed to contact the SFMTA regarding the RFP process through Winnie (need last name).

34. After Steven Kay's September 23, 2009 email was sent, and on that same day, Nat Ford sent an email to SFMTA officials Bond Yee ("Mr. Yee") and Amit Kothari ("Mr. Kothari") saying, "we need to talk about this", referring to the RFP results.

35. Additionally, a September 25, 2009 SFMTA staff email mentions Nat Ford's "concern" regarding the RFP results.

36. Following the improper contact made by Steven Kay, Nat Ford's concern about the RFP results and the SFMTA staff learning of such concern, the SFMTA held meetings regarding undisclosed matters concerning parking garage facilities on September 28 and October 13, 2009.

37. On or about October 26, 2009, Steven Kay, sent a letter to SFMTA Director Nat Ford requesting that the RFP results be rejected.

38. On November 2, 2009, Mr. Kothari sent an email mentioning a proposal was to be voted on the following day that would give Nat Ford the power to unilaterally reject the RFP and do a new one.

39. On November 3, 2009, that proposal was passed, giving Nat Ford power to reject the RFP himself.

40. On November 24, 2009, the SFMTA Board was informed that the RFP results were being rejected by Nat Ford to eliminate performance based compensation as well as to regroup all parking garage contracts.

41. On November 30, 2009, the bidders in the RFP were informed that the RFP results were rejected by the SFMTA, but were not told what the SFMTA Board was told – that the reason was to eliminate performance based compensation or to regroup the parking garage contracts

42. On December 1, 2009, IMCO protested the rejection of their bid.

43. On the heels of IMCO's protest over the rejection of their bid, during December of 2009, Pacific requested a meeting with Impark and Convenient representatives.

44. Also during December of 2009, the SFMTA Board requested their staff to provide justification for rejection of the RFP at the next Board meeting.

45. On December 31, 2009, Mr. Bekele and Ward Thomas ("Mr. Thomas"), Mr. Bekele's partner in IMCO, among others, attended a meeting at 100 Embarcadero Street, San Francisco, at the law offices of Steven Kay. Present also at the meeting were representatives from Pacific and Mr. Scott Hutchinson of Five Star.

46. During the meeting, Mr. Hutchinson informed Mr. Bekele and Mr. Thomas that if they did not reach an agreement to give up some of the parking garages IMCO had won in the bidding process, that "they" had "so much 'juice' in the City" that they could stall the contract award process, or get IMCO's contract rejected altogether.

47. Also during that meeting, Steven Kay stated that Nat Ford had given him approval to mediate the meeting.

48. On January 4, 2010, Mr. Thomas, Mr. Bekele and others attended a meeting at One South Van Ness, at Nat Ford's office in San Francisco. During that meeting Nat Ford confirmed his knowledge of the meeting that had taken place at Steven Kay's offices on December 31, 2009.

49. On January 5, 2010, Mr. Bekele, Mr. Thomas, Mr. Hutchinson and others attended a meeting with SFMTA staff. SFMTA staff Mr. Yee, Ms. Harmon and Mr. Kotari were at that meeting where Mr. Bekele was told it was "in the best interest of the City" to recommend to the SFMTA Board that the contract be awarded as is.

50. IMCO did not agree to the back door deal that was proposed, believing it would have contravened multiple laws.

<u>After Being Improperly Lobbied, SFMTA Changes Its Mind And Rescinds The Winning Bid</u>

51. In retaliation for IMCO's refusal to acquiesce to this deal, Steven Kay and his clients improperly lobbied SFMTA officials and Board members to reverse the award, in order to allow the project to be awarded to a company connected to powerful interests in the City.

52. Despite the pressure exerted by Steven Kay's lobbying, SFMTA staff continued to recommend that IMCO receive a contract based on their winning bid.

53. However, Mr. Bekele received direct threats in person, warning that the contract between the City and IMCO would be delayed if he did not agree to a back room deal to privately rearrange the award.

54. Ultimately, the SFMTA folded under the pressure of the lobbying of powerful special interests when Nat Ford unilaterally rescinded the RFP in which IMCO won its bid for Group A, and began to establish another RFP for those parking garage contracts.

55. The newly issued RFP increased the threshold limits of liquid capital requirements to bid on the contracts from $500,000.00 to $1,000,000.00 (or the undefined two months working capital), which inured to the advantage of the more well capitalized bidders such as Pacific and Five Star. Whereas under the previous RFP, IMCO could meet the $500,000.00 liquid asset requirement, allowing them to bid on the Group A contract, and Mr. Bekele was capable of bidding on the Group C contract as a prime, with Convenient's $250,000.00 in working capital, this new RFP made it more difficult for IMCO to bid, and impossible for Mr. Bekele to bid on any part of the contract as a prime.

56. The new RFP also doubled the amount of parking management fees awarded, greatly increasing the costs to the City.

57. Ironically, the new RFP had received fewer bids than the former RFP, directly contradicting the SFMTA's reasoning it had put forward in its November 30, 2009 letter to the winning bidders.

## CAUSES OF ACTION

### First Cause Of Action – 42 U.S.C. §1983 – Deprivation Of Rights

58. Plaintiffs incorporate the allegations stated in paragraphs 1 through 57 of the complaint as though fully set forth herein.

59. The City, SFMTA and Nat Ford, through the conduct above described, each deprived Plaintiffs of their right to due process of law, equal protection of the laws and to contract.

60. As an actual and proximate result of the conduct above-described, Plaintiffs have suffered damages in an amount to be proven at trial.

Second Cause Of Action - 42 U.S.C. §§1983 & 1985 - Conspiracy To Violate Civil Rights

61. Plaintiffs incorporate the allegations stated in paragraphs 1 through 60 of the complaint as though fully set forth herein.

62. The City, SFMTA and Nat Ford, through the conduct above described, each conspired with the other to agree to deprive Plaintiffs of their right to due process of law, equal protection of the laws and to contract.

63. The City, SFMTA and Nat Ford, through the conduct above described each intended to agree as described in paragraph 62 and each intended that the object of the agreement be achieved.

64. The object of the agreement to deprive Plaintiffs of their rights succeeded and was the actual and proximate cause of damage to them in an amount to be proven at trial.

Third Cause Of Action - 42 U.S.C. §§1983, 1985 & 1986 - Failure To Prevent Civil Rights Violation

65. Plaintiffs incorporate the allegations stated in paragraphs 1 through 64 of the complaint as though fully set forth herein.

66. The City, SFMTA and Nat Ford, through the conduct above described, each failed to prevent the deprivation of Plaintiffs' right to due process of law, equal protection of the laws and to contract.

67. As an actual and proximate result of the conduct above-described, Plaintiffs have suffered damages in an amount to be proven at trial.

Fourth Cause Of Action - Violation Of Civil Code §52.1(b) - Interference With Rights

68. Plaintiffs incorporate the allegations stated in paragraphs 1 through 67 of the complaint as though fully set forth herein.

69. By threats, intimidation and coercion, the City, SFMTA and Nat Ford, through the conduct above described, each interfered with Plaintiffs' right to due process, equal protection of the laws and to contract.

70. As an actual and proximate result of the conduct above-described, Plaintiffs have suffered damages in an amount to be proven at trial.

### Fifth Cause Of Action - Breach of Contract

71. Plaintiffs incorporate the allegations stated in paragraphs 1 through 70 of the complaint as though fully set forth herein.

72. The City and SFMTA's RFP was a solicitation of offers.

73. IMCO submitted an offer in the form of a bid.

74. The City and SFMTA accepted IMCO's bid.

75. By rescinding the RFP results previously accepted, by doing another RFP and by refusing to contract with IMCO as promised in its prior acceptance of IMCO's bid, the City and SFMTA breached its contract with IMCO.

76. As a result of such breach, Plaintiffs were damaged in an amount to be proven at trial.

### Sixth Cause Of Action - Breach Of Implied Covenant Of Good Faith And Fair Dealing

77. Plaintiffs incorporate the allegations stated in paragraphs 1 through 76 of the complaint as though fully set forth herein.

78. IMCO had a contract with the City and SFMTA as stated in paragraphs 72-74.

79. IMCO was ready, willing and able to substantially perform the contract.

80. The actions of Nat Ford, the City and the SFMTA in rescinding the contract prevented IMCO from receiving the benefits therefrom.

81. The actions of Nat Ford, the City and the SFMTA in rescinding the contract were done with a lack of good faith and fair dealing.

82. As a result of such breach of the implied covenant of good faith and fair dealing, Plaintiffs were damaged in an amount to be proven at trial.

### Seventh Cause Of Action - Violation Of §17200, Et. Seq. - Unlawful Business Practices

83. Plaintiffs incorporate the allegations stated in paragraphs 1 through 82 of the complaint as though fully set forth herein.

84. The actions of the City, SFMTA and Nat Ford complained of above constitute unlawful, unfair and fraudulent business practices within the meaning of Business and Professions Code §17200, Et. Seq.

85. As a result of the actions of the City, SFMTA and Nat Ford complained of above, Plaintiffs have been damaged in an amount to be proven at trial.

### Eighth Cause Of Action - Negligent Interference With Contractual Rights

86. Plaintiffs incorporate the allegations stated in paragraphs 1 through 85 of the complaint as though fully set forth herein.

87. The actions of the City, SFMTA and Nat Ford complained of above lead to Plaintiffs' losing a contract they had already won and any benefits due thereunder.

88. The City, SFMTA and Nat Ford had a duty to not interfere with Plaintiffs' contractual rights.

89. By their actions complained of above, the City, SFMTA and Nat Ford breached that duty.

90. That breach was the actual and proximate cause of damages to Plaintiffs in an amount to be proven at trial.

### Ninth Cause Of Action - Intentional Interference With Contractual Rights

91. Plaintiffs incorporate the allegations stated in paragraphs 1 through 90 of the complaint as though fully set forth herein.

92. The actions of the City, SFMTA and Nat Ford complained of above lead to Plaintiffs' losing a contract they had already won and any benefits due thereunder.

93. By their actions complained of above, the City, SFMTA and Nat Ford intentionally interfered with Plaintiffs' contractual rights.

94. That intentional interference was the actual and proximate cause of damage to Plaintiffs in an amount to be proven at trial.

Tenth Cause Of Action – Negligent Interference With Prospective Economic Advantage

95. Plaintiffs incorporate the allegations stated in paragraphs 1 through 94 of the complaint as though fully set forth herein.

96. The actions of the City, SFMTA and Nat Ford complained of above lead to Plaintiffs' losing a contract they had already won and any benefits due thereunder.

97. The City, SFMTA and Nat Ford had a duty to not interfere with Plaintiffs' prospective economic advantage.

98. By their actions complained of above, the City, SFMTA and Nat Ford breached that duty.

99. That negligent interference was the actual and proximate cause of damages to Plaintiffs in an amount to be proven at trial.

Eleventh Cause Of Action – Intentional Interference With Prospective Economic Advantage

100. Plaintiffs incorporate the allegations stated in paragraphs 1 through 99 of the complaint as though fully set forth herein.

101. The actions of the City, SFMTA and Nat Ford complained of above lead to Plaintiffs' losing a contract they had already won and any benefits due thereunder.

102. By their actions complained of above, the City, SFMTA and Nat Ford intentionally interfered with Plaintiffs' prospective economic advantage.

103. That intentional interference was the actual and proximate cause of damages to Plaintiffs in an amount to be proven at trial.

## STATUTORY PENALTIES

Due to the foregoing actions of Defendants, and in addition to the relief requested below, Plaintiffs are entitled to the following:

1. Pursuant to Civil Code §52, a civil penalty of three times their actual damages proven at trial;

2. Pursuant to Civil Code §52, a civil penalty of $25,000.00, as well as, punitive damages and attorney fees for the same;

3. Pursuant to Civil Code §§52.1(b) and 52.1(h), in addition to the damages available pursuant to Civil Code §52, reasonable attorney fees for Defendants' violation of Civil Code §52.1(a).

## RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

1. Compensatory damages according to proof against all Defendants;

2. Special damages according to proof against all Defendants;

3. Punitive damages against individual Defendants in an amount to be proven at trial;

4. Attorneys' fees;

5. Expert witness fees;

6. Costs incurred in this matter;

7. Injunctive relief to reinstate Plaintiffs' winning bid and to restrain Defendants from awarding the afore-mentioned parking contract to anyone else;

8. Prejudgment interest at the maximum legal rate; and

9. Any other relief as the Court finds just and proper.

Dated: April 4, 2011                                    GONZALEZ & LEIGH, LLP

By _____
G. Whitney Leigh
Attorneys for Plaintiffs